Filed 10/20/23  P. v. Mayes CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>   v.<br><br>STEDVIENO MAYES,<br><br>        Defendant and Appellant. | C097314<br><br>(Super. Ct. Nos. STK-CR-FE-2011-0007803, SF119150A) |

Defendant Stedvieno Mayes appeals from a post-judgment order denying his petition, filed under Penal Code former section 1170.95 (now § 1172.6 (Stats. 2022, ch. 58, § 10); statutory section citations that follow are found in the Penal Code unless otherwise stated), to have his murder conviction vacated and to be resentenced on his remaining convictions.

In 2013, a jury found defendant guilty of numerous crimes, including first degree murder, two counts of kidnapping for purposes of robbery, and one count of first degree

1

robbery. The relevant facts may be briefly stated. Defendant and another man, Xavier Spivey, kidnapped two young women at gunpoint and forced them into a house where one of the women lived. Inside the house, Spivey and defendant ordered the women onto the kitchen floor. Spivey then ransacked the place and took various items from the women while defendant stood guard over them in the kitchen. Spivey was armed with a .45-caliber assault weapon; defendant was armed with a smaller caliber handgun, but did not point it at the women, and reassured them they would not be harmed as long as they did what they were told. Defendant and Spivey left the house about 20 minutes later. While apparently on his way to a nearby waiting vehicle, Spivey got into an argument over "some gang shit" with a group of young men who were hanging out in front of a house down the street. Spivey then fired a single round, killing one of the men, Br.W.

On appeal from the denial of his resentencing petition, defendant contends the evidence is insufficient to support the trial court's finding that he acted with reckless indifference to human life under the factors set forth by our Supreme Court in *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). We agree and shall remand the matter to the trial court with directions to vacate defendant's murder conviction and resentence him on his remaining convictions.

## FACTS AND HISTORY OF THE PROCEEDINGS

At the hearing on defendant's resentencing petition, the matter was submitted on the trial transcript in the underlying matter. The following summary of relevant facts is based on that transcript.

A.    Defendant's Participation in the Kidnappings and Robbery

On the night of June 18, 2011, B.W. and her close friend, B.A., were at B.W.'s house in Stockton. They left the house at around 11:00 p.m. to get something to eat. When they got to B.W.'s car, which was parked a short distance away, Spivey and

2

defendant approached them on foot wearing dark hooded sweatshirts. Both men were armed.

As defendant explained in this police interview, he and Spivey had been dropped off in the area to "get stuff" and "try to bust some knocks." A neighbor, M.D., who lived down the street, saw defendant and Spivey make their approach. He testified that a truck he had never seen before was parked on the corner and two men walked towards B.W. and B.A. from the direction of that truck.

B.W. testified that M.D. also approached her at the same time as defendant and Spivey. B.W. paused before opening her driver's side door to say something to M.D., but was interrupted by Spivey, who stepped in between the two, pointed a gun at M.D., and said, "back up." The gun was a black .45-caliber assault weapon with a long black clip, similar to a MAC-10. M.D. complied with Spivey's command and returned to his house. Spivey then turned the gun on B.W. and said, "be quiet, don't scream, turn around and go open the door," referring to the front door of her house. Spivey turned B.W. towards the house, pressed the gun into her back, and started following her to the house. As Spivey made contact with B.W. on the driver's side of the car, defendant made contact with B.A. on the passenger's side of the car. The record does not reveal whether defendant displayed his gun at this point in the encounter, or whether he said anything to B.A., but they did follow B.W. and Spivey back to the house.

Inside the house, Spivey and defendant told B.W. and B.A. to lie face down on the kitchen floor. As B.W. explained, "they were both kind of barking orders." B.W. tried to do so, but was "too scared to stay down" and "kept sitting up." At this point, B.W. saw that defendant also had a gun, which she described as a silver .22-caliber handgun. He was not pointing the gun at them but was "[j]ust holding it" and "resting his arm on the countertop with it." Defendant told them to "be quiet" and "calm down," and reassured them that, as B.W. put it, "after they are done getting what they are getting, they will leave, that they are not going to hurt us." While defendant stood guard over B.W. and

3

B.A. in the kitchen, Spivey was "[t]earing up the house," saying: "Where is the money? Where's the gun[?] This is not all the money. Be quiet. Don't look at me. Put your face down."

Spivey ransacked the house for about 20 minutes while defendant continued reassuring B.W. and B.A. that they were not going to be hurt as long as they "let [Spivey] finish doing what he's doing." Spivey took various items from the women, including their purses and cell phones. Eventually, defendant told B.W. and B.A. to go to the bathroom, get in the bathtub, and count to a certain number before coming out. B.W. believed defendant would shoot them if they came out too soon, so she counted to the prescribed number and then went to the front door to lock it.

B.      Spivey Murders Br.W. While Fleeing

Meanwhile, after leaving B.W.'s house, Spivey got into an argument with someone in front of M.D.'s house. M.D. testified that he was hanging out on the porch in front of the house that night with his younger brother, Br.W., and two friends. While M.D.'s testimony omits any reference to an argument, defendant stated in his police interview that Spivey was arguing with "the dudes across the street" about "some gang shit." According to defendant, he was not in Spivey's immediate presence during this argument because defendant claimed he turned left after leaving B.W.'s house, whereas M.D.'s house was a short distance away in the other direction. Defendant claimed he saw a truck drive by, there was "a big ass flash, pow," and then Spivey was no longer in the street. Defendant speculated that Spivey might have known the person in the truck and got inside as it drove off.

Returning to M.D.'s testimony, he claimed he left the front porch area to throw away some cans on the side of the house and then heard "a firecracker sound." When M.D. returned to the front, he "heard a truck going down the street" and saw his brother "laid out on the porch" saying he was hit. M.D. assumed the shooter was one of the men

4

who were just inside B.W.'s house, so he and one of his friends ran over to her house to see if she knew who they were. They got there just after B.W. and B.A. emerged from the bathroom.

Br.W. was hit in his right pelvis by a .45-caliber bullet. The bullet perforated two large blood vessels, causing him to bleed to death.

We finally note that B.W. identified Spivey and defendant in separate photo lineups as the people who kidnapped and robbed her and also identified them at trial. When defendant's apartment was searched by police five days after the shooting, various items taken during the robbery were found strewn about the apartment. The .45-caliber assault weapon Spivey used during the kidnapping and robbery was also found in a closet.

C.     Procedural History

A jury found defendant guilty of first degree murder, two counts of kidnapping for purposes of robbery, and one count of first degree robbery; the jury also found true allegations that defendant personally used a firearm during the commission of the kidnappings and robbery. The trial court subsequently found defendant was previously convicted of a strike offense within the meaning of the Three Strikes law and sentenced him to an aggregate prison term of 98 years to life, plus 25 years 4 months.

On appeal from this underlying judgment, we remanded the matter to correct a sentencing error but otherwise affirmed the judgment. (*People v. Mayes* (July 7, 2015, C073853) [nonpub. opn.].) On remand, defendant was sentenced to an aggregate prison term of 98 years to life, plus 10 years.

In 2019, defendant filed a petition under former section 1170.95 to have his murder conviction vacated and to be resentenced on his remaining convictions. Despite the fact that defendant made a prima facie showing of entitlement to relief in his petition, the trial court found defendant ineligible for resentencing in a written order, entered

5

without appointing counsel for defendant or eliciting additional briefing. On appeal from that order, we held the trial court erred by summarily denying the petition. We therefore reversed the order and remanded the matter to the trial court with directions to appoint counsel for defendant and proceed in accordance with the requirements of former section 1170.95. (*People v. Mayes* (June 28, 2021, C090622) [nonpub. opn.].)

On remand, the trial court appointed counsel for defendant, set a briefing schedule, and ultimately denied the petition after holding a hearing. The trial court's reasoning will be set forth in the discussion portion of this opinion.

Defendant contends the evidence is insufficient to support the trial court's finding that he acted with reckless indifference to human life under the factors set forth by our Supreme Court in *Clark*, *supra*, 63 Cal.4th 522. The People disagree, arguing there is substantial evidence supporting the reckless indifference finding. We agree with defendant.

DISCUSSION

I

*Recent Changes to the Murder Statutes*

Before assessing the sufficiency of the evidence supporting the trial court's finding of reckless indifference, we briefly set forth the recent changes to California's murder statutes made by Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437). (Stats. 2018, ch. 1015, § 2.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) As amended by Senate Bill 1437, effective January 1, 2019, section 188 provides, in relevant part: "[M]alice may be express or implied. [¶] (1) Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature. [¶] (2) Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.

6

[¶] (3) Except as stated in subdivision (e) of [s]ection 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a).)

Section 189 describes a number of unlawful killings that are statutorily defined as "murder of the first degree," including a killing "committed in the perpetration of, or attempt to perpetrate, [certain listed felonies, including] robbery [and] kidnapping." (§ 189, subd. (a).) This form of first degree murder, known as first degree felony murder, does not require malice. At the time of defendant's trial, prior to Senate Bill 1437, " 'the only criminal intent required [was] the specific intent to commit the particular felony.' " (*People v. Dillon* (1983) 34 Cal.3d 441, 475.)

Senate Bill 1437 amended the felony-murder rule to provide, in relevant part: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e).)

Thus, at the time of defendant's trial, as long as the jury concluded Br.W. was killed during the commission of either the kidnapping or the robbery perpetrated against B.W. and B.A., the only mental state required for conviction of first degree felony murder was defendant's intent to commit the underlying felony. Now, since defendant was not the actual killer and did not intend to kill Br.W., in order to convict him of the murder on a felony-murder theory, the prosecution would be required to prove that he

7

was a major participant in the kidnapping/robbery and acted with reckless indifference to human life.

Finally, Senate Bill 1437 created a mechanism for a defendant convicted of felony murder under the prior law to seek the ameliorative benefits of the new law. The current provision setting forth that mechanism, section 1172.6, provides in relevant part: "A person convicted of felony murder . . . may file a petition with the court that sentenced the petitioner to have the petitioner's murder . . . conviction vacated and to be resentenced on any remaining counts when all of the following conditions apply: [¶] (1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder . . . . [¶] (2) The petitioner was convicted of murder . . . . [¶] (3) The petitioner could not presently be convicted of murder . . . because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a).)

## II

### *Banks, Clark, and Scoggins*

The trial court denied defendant's petition to vacate his murder conviction and for resentencing on the remaining counts, concluding he could be convicted of felony murder under the new law because he was a major participant in the underlying felonies who acted with reckless indifference to human life, as those statutory phrases were clarified by our Supreme Court in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), *Clark*, *supra*, 63 Cal.4th 522, and *In re Scoggins* (2020) 9 Cal.5th 667 (*Scoggins*). Because defendant challenges the sufficiency of the evidence only with respect to the reckless indifference finding, we limit our discussion of these cases to the mens rea requirement.

In *Banks*, *supra*, 61 Cal.4th 788, our Supreme Court explained that section 190.2, subdivision (d), requiring both major participation in the underlying felony and reckless indifference to human life in order for a felony-murder special circumstance to apply to a nonkiller, "was designed to codify the holding of *Tison v. Arizona* (1987) 481 U.S. 137

8

[], which articulates the constitutional limits on executing felony murderers who did not personally kill. *Tison* and a prior decision on which it is based, *Enmund v. Florida* (1982) 458 U.S. 782 [], collectively place conduct on a spectrum, with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*Banks*, at p. 794.)

At one end of the spectrum is a defendant like Enmund, who was the getaway driver in a planned armed robbery that resulted in the unplanned murder of the robbery victim and his wife. The *Enmund* court "found a broad consensus against imposing death in cases 'where the defendant did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder.' [Citation.]" (*Banks*, *supra*, 61 Cal.4th at p. 799.) At the other end of the spectrum are "actual killers and those who attempted or intended to kill." (*Id*. at p. 800.) In between these extremes, but falling on the permissible side of the constitutional line, are defendants like the Tison brothers, who "helped plan and carry out the escape of two convicted murderers from prison," including their father, who "was serving a life sentence for killing a guard in the course of a previous escape." (*Banks*, at p. 802.) The Tison brothers brought "a cache of weapons to prison, arm[ed] both murderers, and [held] at gunpoint guards and visitors alike." (*Banks,* at p. 802.) During their subsequent escape, they carjacked and kidnapped a family of four, took the family's possessions, and the convicted murderers "then killed all four family members." (*Id*. at p. 799.) While the Tison brothers did not kill or intend to kill, their " 'major participation in the felony committed, combined with reckless indifference to human life, [was] sufficient to satisfy the *Enmund* culpability requirement.' [Citation.]" (*Banks*, at p. 800.)

Elaborating on the mens rea requirement, our Supreme Court explained that "*Tison,* and in turn section 190.2[, subdivision ](d), look to whether a defendant has ' "knowingly engag[ed] in criminal activities known to carry a grave risk of death." '

9

[Citations.] The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death *his or her actions* create." (*Banks*, *supra*, 61 Cal.4th at p. 801, italics added.) Holding the evidence was insufficient to establish this mental state, the *Banks* court explained: "There was evidence from which the jury could infer [the defendant] knew he was participating in an armed robbery. But nothing at trial supported the conclusion beyond a reasonable doubt that [he] knew *his own actions* would involve a grave risk of death. There was no evidence [he] intended to kill or, unlike the Tisons, knowingly conspired with accomplices known to have killed before. Instead, as in *Enmund*, [the shooter's] killing of [the victim] was apparently a spontaneous response to armed resistance from the victim." (*Banks*, at p. 807, italics added.)

In *Clark*, *supra*, 63 Cal.4th 522, our Supreme Court vacated special circumstance findings where the defendant was "the mastermind who planned and organized the attempted robbery and who was orchestrating the events at the scene of the crime." (*Id*. at p. 612.) There, the defendant and his brother and cousin conducted surveillance of a computer store, studying the number of employees and their activities around closing time. The defendant also secured use of a U-Haul truck by having another person rent the truck using a false driver's license the defendant helped her procure. (*Id*. at pp. 536, 612.) The plan was for one man, Ervin, to enter the store around closing time with a gun thatwas "apparently [supposed] to be unloaded," and handcuff the remaining employees in the restroom so no one could call the police. (*Id*. at p. 613.) Then, while the defendant sat in the parking lot in a BMW, his brother and another man, who apparently believed the store belonged to the defendant, were to help Ervin remove computers from the store and load them into the U-Haul, which was parked nearby. However, before any computers could be removed, the mother of one of the handcuffed employees came into the store. Ervin shot her in the head and fled to the defendant's car. The defendant drove away, leaving Ervin to be arrested in the parking lot by an officer who heard the gunshot

10

while on patrol near the store. The gun Ervin used to murder the victim had been loaded with one bullet. (*Id.* at pp. 536-538, 613.)

The *Clark* court concluded "the evidence was insufficient to support that [the defendant] exhibited reckless indifference to human life." (*Clark*, *supra*, 63 Cal.4th at p. 614.) While noting that the "defendant had a prominent, if not the most prominent, role in planning the criminal enterprise that led to the death of [the victim]" (*id.* at p. 613), and acknowledging that the two elements are interrelated such that " 'the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life' " (*id.* at p. 615, quoting *Tison v. Arizona, supra*, 481 U.S. at p. 153), the court went on to explain that even significant participation in an armed robbery does not necessarily entail possession of the requisite mental state. (*Clark,* at p. 617.) Instead, the reckless indifference defined in *Tison* "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, at pp. 616-617.)

The *Clark* court then applied the following factors to the facts before it in determining whether or not the defendant was recklessly indifferent to human life: Did the defendant know a gun would be used and/or personally use a gun during the robbery? Was the defendant physically present at the scene of the murder, and therefore provided with an opportunity to restrain the murderer or aid the victim? What was the duration of the interaction between the perpetrators and the victims? Did the defendant have knowledge of his or her cohort's likelihood of killing? Did the defendant apparently take steps to minimize the risk of violence? The first four factors were culled from case law; the fifth was added as a matter of first impression. (*Clark*, *supra*, 63 Cal.4th at pp. 618-622.)

Applying these factors, the *Clark* court held the evidence did not support a conclusion the defendant was recklessly indifferent to human life. The court explained

11

while the defendant knew a gun would be used, that fact alone is insufficient to establish reckless indifference.  The only gun used during the attempted robbery was carried by Ervin, not the defendant, and that gun was loaded with only one bullet.  (*Clark*, *supra*, 63 Cal.4th at pp. 618-619.)  Unlike *Tison*, where the Tison brothers were "physically present during the entire sequence of events culminating in the murders," and were therefore presented with "an opportunity to act as a restraining influence on murderous cohorts," the defendant in *Clark* was in his car in the parking lot when the victim was shot and was not provided with such an opportunity.  (*Clark,* at p. 619.)  Acknowledging "[t]he jury may have inferred that [the defendant] was aware [the victim] had been shot when he drove from the scene," indicating a "desire to flee the scene as quickly as possible, without regard for [the] welfare . . . of the shooting victim," the court nevertheless distinguished this level of culpability from that of the Tison brothers because, "unlike in [*Tison*], defendant would have known that help in the form of police intervention was arriving."  (*Clark,* at p. 620.)

With respect to duration of the interaction between victims and perpetrators, the court noted the defendant planned the robbery for closing time, when most employees would be gone, and those who remained would be handcuffed in the bathroom.  Thus, while the robbery would take some time to complete, "the period of interaction between perpetrators and victims was designed to be limited."  (*Clark*, *supra*, 63 Cal.4th at p. 620.)  At the same time, the court explained, "Because the robbery was planned for a public space and involved the prolonged detention of employees, the crime did involve the risk of interlopers, such as [the murder victim].  But overall, the evidence was insufficient to show that the duration of the felony under these circumstances supported the conclusion that defendant exhibited reckless indifference to human life."  (*Id*. at pp. 620-621.)  There was no evidence that Ervin was known to have a propensity for violence or that the defendant had any knowledge of such a propensity.  (*Id*. at p. 621.)

12

Finally, the court considered the defendant's "apparent efforts to minimize the risks of violence," i.e., (1) the robbery was planned for closing time when most employees would be gone, (2) the gun was apparently supposed to have been unloaded, and (3) the gun was loaded with only one bullet (*Clark*, *supra*, 63 Cal.4th at pp. 621-622), and concluded: "[T]here is evidence that defendant planned the crime with an eye to minimizing the possibilities for violence. Such a factor does not, in itself, necessarily preclude a finding of reckless indifference to human life. But here there appears to be nothing in the plan that one can point to that elevated the risk to human life beyond those risks inherent in any armed robbery." (*Id*. at p. 623.)

Our Supreme Court also held the evidence was insufficient to establish reckless indifference to human life in *Scoggins*, *supra*, 9 Cal.5th 667. We need not provide as detailed an overview of the "fact-intensive, individualized inquiry" (*id*. at p. 683) in that case. It will suffice to recount the concise description provided by our colleagues at the First Appellate District in *In re Moore* (2021) 68 Cal.App.5th 434: "Although [Scoggins] planned the robbery [citation], knew about his confederates' violent tendencies [citation], and instructed them 'to "beat the shit out of" ' the victim [citation], he did not 'know that a gun would be used' [citation], 'was not physically present at the crime scene' [citation], and never instructed his confederates to kill the victim [citation]. Given these mitigating circumstances, the 'limited' duration of the interaction between the shooter and the victim [citation], and the location of the robbery 'in a public parking lot during the daytime' [citation], our high court held that 'the evidence . . . "does not suggest an elevated risk to human life beyond those risks inherent in an unarmed beating and robbery" ' [citation]." (*Id*. at p. 450.)

### III

### *Sufficiency of the Evidence Regarding Reckless Indifference*

We conclude consideration of the *Clark* factors similarly preclude a reckless indifference finding in this case.

The first *Clark* factor admittedly works against defendant, as the trial court found. Defendant knew a gun would be used by Spivey and personally used a gun of his own, although the evidence does not establish whether defendant's gun was loaded. As the *Clark* court observed, while "[t]he mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life[,]" the "*use* of a firearm . . . can be significant to the analysis." (*Clark*, *supra*, 63 Cal.4th at p. 618.) Thus, the first factor supports a finding of reckless indifference, although we consider defendant's use of the gun in this case to be somewhat mitigated by the fact that he never pointed it at either B.W. or B.A. and repeatedly attempted to keep them calm. Moreover, defendant did not use his gun after leaving B.W.'s house, when the actual shooting of Br.W. took place. The trial court did not mention these mitigating circumstances in its ruling, but did note that defendant was in possession of the murder weapon, as well as other firearms, when his apartment was searched five days later, and he was prohibited from possessing any weapons due to his status as a convicted felon. While true, these additional facts do not shed any light on whether defendant's personal use of the smaller caliber handgun during the kidnapping and robbery created a significant risk of death beyond that inherent in any armed robbery. (See *Clark*, *supra*, 63 Cal.4th at p. 623 [defendant's personal conduct must have "elevated the risk to human life beyond those risks inherent in any armed robbery"].) Nevertheless, we accept that this factor supports the trial court's ruling.

The second factor does not support a finding of reckless indifference. The trial court concluded it did, noting defendant was personally present and actively participated in the kidnapping and robbery. This is true. The trial court also stated that defendant "threatened to harm the women and shoot them if they basically got in the[] way of their escape." The record does not support this statement. B.W. testified that defendant repeatedly reassured her and B.A. that they would not be harmed as long as they followed instructions. He later told them to get in the bathtub and count to a specific number,

14

adding that he and Spivey "would be waiting outside to make sure [they] did count." He did not threaten to shoot them if they left too soon. B.W. assumed he would do so and followed his instructions. This assumption was reasonable given the circumstances, but defendant did not threaten to shoot them if they interfered with their escape.

Defendant was, however, present during the kidnapping and robbery, as the trial court found. But the murder happened down the street in front of M.D.'s house. The relevant consideration is whether defendant was physically present *at the scene of the murder*, and therefore provided with an opportunity to restrain the murderer or aid the victim. The trial court disbelieved defendant's statement that he and Spivey went separate directions when they left B.W.'s house, saying it "doesn't make sense when they arrive together, they commit the crime together, . . . and then ultimately [defendant] ended up with the .45-caliber handgun." We are also skeptical of defendant's account of what happened after they left B.W.'s house. Defendant might have turned right instead of left when he left B.W.'s house. He and Spivey might have passed by M.D.'s house together, on their way to a waiting truck, which may have been the same truck that apparently dropped them off before they kidnapped B.W. and B.A. And if so, then defendant would probably have been close enough to Spivey when he got into the argument with the men in front of M.D.'s house to be considered present at the scene of the murder. But this is speculation. There is no actual evidence that defendant was present at the scene of the murder. Disbelieving defendant's statement that he was down the street does not equal affirmative evidence that he was actually close enough to have intervened in the murder.

Again, presence at the scene of the murder is the relevant consideration. As the *Clark* court explained, physical presence is "particularly significant" in a case like *Tison*, where the murder was "a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, 'the defendant's presence allows

15

him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.' [Citation.]" (*Clark*, *supra*, 63 Cal.4th at p. 619.)

Here, again, there was no *evidence* that defendant was close enough to act as a restraining influence, making this case more like *Scoggins*, *supra*, 9 Cal.5th 667, where the evidence did not support a finding that Scoggins was any closer than an adjacent parking lot when the shooting occurred, with an obstructed view of the robbery as it unfolded, and therefore had no control over the shooter's actions, "especially given how quickly the shooting occurred." (*Id*. at pp. 678-679.)

The *Scoggins* court also "emphasize[d] that 'physical presence is not invariably a prerequisite to demonstrating reckless indifference to human life.' [Citation.] 'Where, for example, a defendant instructs other members of a criminal gang carrying out carjackings at his behest to shoot any resisting victims, he need not be present when his subordinates carry out the instruction in order to be found to be recklessly indifferent to the lives of the victims.' [Citations.] Especially in light of emerging technologies, a defendant who plans and directs a murder from afar may be just as culpable as a defendant who is physically present at the scene of the crime." (*Id*. at p. 679.) But here, as in *Scoggins*, there is no evidence that defendant directed Spivey to kill under any scenario.

Moreover, also like *Scoggins*, the murder was sudden and unexpected. Spivey and the men in front of M.D.'s house exchanged gang-related words, during which Spivey fired a single round at the men, hitting and killing Br.W., and then apparently fled in the truck that passed by. This must have happened in a matter of seconds because all of it— from defendant and Spivey leaving B.W.'s house, to the argument and shooting, to M.D. and a friend running over to B.W.'s house—happened in the amount of time it took B.W.

16

and B.A. to finish counting.  Thus, aside from there being no actual evidence that defendant was present at the scene of the murder, there also is no evidence that he would have been in any position to act as a restraining influence on Spivey even if he was there.

We do acknowledge that presence and failure to render aid to the victim was also noted in *Tison*.  Regardless of which way defendant turned when he left B.W.'s house, he was present enough to have heard the shot and seen the muzzle flash, and he certainly fled, either with Spivey in the truck or on foot in the opposite direction.  However, given the unexpected nature of the shooting, defendant's flight from the scene is as easily reconcilable with shock as it is with callous indifference.  Moreover, defendant could have reasonably assumed that there were multiple people in front of M.D.'s house, any of whom could call for medical assistance.  Thus, like *Clark*, and unlike *Tison*, it is "difficult to infer [defendant's] frame of mind concerning [Br.W.'s] death" from the fact that he ran when Spivey pulled the trigger.  (*Clark*, *supra*, 63 Cal.4th at p. 620.)

The third factor, duration of the felony, does support the trial court's ruling. Defendant and Spivey were inside B.W.'s house for about 20 minutes, during which defendant stood guard over B.W. and B.A. while holding a gun.  This "prolonged period of restraint" by defendant created " 'a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark*, *supra*, 63 Cal.4th at p. 620.) However, we also consider this factor somewhat mitigated by the fact that defendant never pointed the gun at the women and simultaneously attempted to keep them calm.  At the same time, however, the evidence reasonably supports a conclusion that M.D. knew Spivey and defendant kidnapped B.W. and B.A. at gunpoint and took them into B.W.'s house.  While M.D. denied approaching B.W. at her car, and further denied seeing any weapons or interacting with Spivey, B.W. testified that M.D. did approach her, at which point Spivey stepped between them, pointed his gun at M.D., and told him to "back up." The evidence therefore supports a conclusion that Spivey and defendant knew that at least one person knew they kidnapped B.W. and B.A. and brought them inside the house.

Despite this knowledge, they spent 20 minutes inside robbing the women, plenty of time for M.D. to have summoned assistance. He did not do so. But the trial court could have reasonably concluded that the length of time defendant and Spivey spent inside the house, notwithstanding having been seen going inside, increased the risk of violence.

The fourth factor is whether defendant possessed knowledge of Spivey's likelihood of killing. In support of this factor, the trial court relied on the fact that Spivey "was armed with an assault weapon and used it to kidnap and rob two women" and that "Spivey had no issues with [defendant] threatening the women with murder if they interfered with the escape." We have already addressed the latter assertion. With respect to the former, we cannot conclude that merely by participating in an armed kidnapping and robbery, where Spivey was armed with an assault weapon, defendant must have known Spivey was likely to use that weapon to kill. This factor does not support the trial court's ruling.

The final *Clark* factor is defendant's efforts to minimize the risks of violence during the kidnapping and robbery. The trial court found no evidence to support this factor. We disagree. Defendant's personal behavior during the robbery supports a reasonable conclusion that his conduct was designed to reduce the risk of violence. Again, he did not point his gun at either B.W. or B.A. and repeatedly reassured them that they would be fine as long as they let Spivey complete the robbery. His personal conduct was apparently designed to turn down the temperature in the room, not increase the risk of violence.

In sum, defendant knew a gun would be used by Spivey during the kidnapping and robbery, although there is no evidence that he knew Spivey was likely to kill someone with it. Defendant also used a gun of his own during the robbery, although whether defendant's gun was loaded is unknown and defendant did not point his gun at the robbery victims. Defendant was present during the kidnapping and robbery, but whether he was also present when Spivey killed the murder victim down the street is unknown,

but even if he was, the events escalated too quickly for us to conclude defendant could have done anything to intervene. And while the robbery took a significant amount of time to complete, defendant repeatedly tried to keep the robbery victims calm during that time in an apparent effort to minimize the risk of violence. On these facts, we cannot conclude the trial court's finding of reckless indifference to human life is supported by substantial evidence. As our Supreme Court has made clear, it is the defendant's "individual culpability" (*Banks*, *supra*, 61 Cal.4th at p. 801) that is at issue here. The question is whether defendant personally possessed "a willingness to kill (or to assist [Spivey] in killing)" (*Clark*, *supra*, 63 Cal.4th at pp. 616-617) or personally "elevated the risk to human life beyond those risks inherent in any armed robbery." (*Id*. at p. 623.) We conclude the answer, given the evidence, is he did not.

Finally, *In re McDowell* (2020) 55 Cal.App.5th 999 (*McDowell*) is also instructive. Indeed, this case is perhaps the most instructive because it goes in the other direction, finding sufficient evidence of reckless indifference to human life, in a case the court acknowledged "may be close to the line." (*Id*. at p. 1015.) There, McDowell and Hutchison planned and executed a home invasion robbery of a drug dealer, Meehan. McDowell was armed with a knife and Hutchison was armed with a handgun when they entered Meehan's home and demanded money and/or drugs. When Meehan said he did not have anything, Hutchison fired a warning shot into the floor. Meehan then told Hutchison to go ahead and kill him. Two guests were also at Meehan's home at the time. One of them told Hutchison not to hurt Meehan, while the other picked up an object and struck McDowell, knocking him down. Meehan then tried to grab Hutchison's gun, causing Hutchison to shoot him twice in the chest. (*Id*. at p. 1005.)

Concluding the evidence supported a finding that McDowell acted with reckless indifference to human life, the court first accepted McDowell's statement that he did not know Hutchison had a gun, but pointed out McDowell himself was armed with a knife, and he necessarily knew Hutchison had a gun at least by the time the warning shot was

fired. (*McDowell*, *supra*, 55 Cal.App.5th at p. 1013.) The court also emphasized that McDowell both planned and actively participated in "a crime with a particularly high risk of violence—a home invasion robbery of a drug dealer." (*Ibid.*) The court further found McDowell took no steps to minimize the "obvious risks of lethal violence" such a plan entailed. (*Id.* at pp. 1013-1014.) Finally, the court also relied on McDowell's presence at the scene of the murder and failure to take any steps to prevent it. Specifically, when Hutchison fired the warning shot and Meehan responded with a dare, "there was a brief but critical opportunity for McDowell to say or do something to deescalate the situation," but he did not. (*Id.* at p. 1014.) However, as we have already noted, the court also acknowledged "this case may be close to the line" given how fast the events unfolded once McDowell and Hutchison entered the home and the lack of any evidence that McDowell knew Hutchison had a violent past. (*Id.* at pp. 1014-1015.)

Three important factors that existed in *McDowell* do not exist in this case. First, there is no evidence that defendant participated in planning the kidnapping and robbery in this case. He seemed to be following Spivey's lead from the start. Second, the kidnapping and robbery in this case does not carry the same "particularly high risk of violence" as a home invasion robbery of a drug dealer, where it is "foreseeable that customers or others could be present . . . and that either the dealer himself or his customers might be armed or high and thus more likely to resist." (*McDowell*, *supra*, 55 Cal.App.5th at p. 1013.) Third, the murder and robbery in this matter did not occur at the same location. While defendant was present at the scene of the robbery, there is only speculation he was also present at the scene of the murder down the street. But again, even if he was, unlike *McDowell*, the evidence does not support a conclusion that there was a window of opportunity for defendant to have interceded to prevent Spivey from shooting Br.W.

We acknowledge the existence of some factors that might favor affirmance. But we have already explained why those factors, while they admittedly exist, are

20

significantly mitigated.  This case, like *McDowell*, is close.  In our view, however, on the unique facts of this case, defendant's individual culpability has not been shown to be sufficient to satisfy what is currently required under the law.

### DISPOSITION

The order denying defendant's resentencing petition under Penal Code section 1172.6 is reversed and the matter is remanded to the trial court with directions to vacate defendant's murder conviction and resentence him on his remaining convictions.


_____

HULL, J.



We concur:



_____

EARL, P. J.



_____

MESIWALA, J.

21